IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

**Gabrielle Schiller,**

        Plaintiff,

v.                                                           Jury Trial Requested

**Northern Suburban**
**Special Recreation Association,**

        Defendant.

## Complaint

The plaintiff, Gabrielle Schiller ("Plaintiff" or "Ms. Schiller"), by and through her attorneys, seeks redress from the defendant, Northern Suburban Special Recreation Association ("Defendant" or "NSSRA"), for disability discrimination, failure to accommodate and retaliation in violation of the Americans with Disabilities Act ("ADA").

### Jurisdiction and Venue

1. This is a civil action arising under Title I of the Americans with Disabilities Act, 42 U.S.C. §12112.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, and 1343.

3. On or about December 2, 2016 Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination, Charge No. 440-2017-00748, alleging failure to provide appropriate accommodations for

her disability and retaliation for requesting accommodations. (See Exhibit A, attached).

4. The EEOC issued a Dismissal and Notice of Suit Rights on August 22, 2017 (see Exhibit B, attached).

5. Plaintiff brings this action within 90 days of having received the Notice of Suit Rights.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391(b) because all of the unlawful employment practices alleged herein occurred in this district.

## The Parties

7. Plaintiff is a resident of Cook County, Illinois and a former employee of Defendant within the meaning of 42 U.S.C. 12111(4). At all relevant times, Plaintiff was disabled.

8. Defendant is an organization which provides recreational services and activities for disabled children and adults.

9. At all relevant times, Defendants employed more than fifteen individuals.

Facts Common to all Claims

10. Ms. Schiller began working for the NSSRA as a Program Assistant in June of 2009 when she was only 16 years old. She was promoted to the position of Program Leader in 2014, a role in which she helped lead recreational activities for disabled individuals and supervised 6 staff members.

11. Throughout her employment, Ms. Schiller received strong performance evaluations, and was given substantial responsibility at a young age because of her demonstrated ability and passion for the work of the organization.

12. For Ms. Schiller, her work at NSSRA was more than a job; it was integral to her personal and professional development, and a vehicle through which she could fulfill her longstanding passion of helping individuals with disabilities thrive. Put simply, Ms. Schiller loved her job and was tremendously dedicated to it.

13. Because of her extraordinary performance, NSSRA promoted Ms. Schiller to the position of Recreational Specialist of Adult Programs starting in February of 2016, a position in which she served until her termination in August of 2016. For Ms. Schiller this was a dream job. It also gave her the independence to move out of her father's apartment and rent her own place.

14. In that role Ms. Schiller organized twenty recreation activities and outings quarterly for individuals 21 years and older with cognitive impairments, executed more than fifty recreation activities for individuals with disabilities

of varying ages, managed more than 30 part-time Program Assistants, and projected and managed quarterly program and annual budgets.

15. NSSRA issued Ms. Schiller a 90-day review of her performance as a Recreational Specialist and rated her as meeting or exceeding expectations in all categories of performance.

16. NSSRA also honored Ms. Schiller with an "Employee of the Summer" award as recognition of her strong leadership of summer programs.

17. Since before the start of her employment at NSSRA, Ms. Schiller was diagnosed with a number of disabilities, including depression and anxiety disorder, attention-deficit/hyperactivity disorder ("ADHD"), chronic fatigue, and fibromyalgia. Those conditions, when aggravated or when she is executing tasks beyond her typical load, make it difficult for her to perform physically strenuous tasks and to manage the symptoms of stress and anxiety.

18. The symptoms of Ms. Schiller's conditions were not very visible and did not normally require that Ms. Schiller request accommodations. The nature and manifestations of Ms. Schiller's disabilities was therefore quite different and much less debilitating than the disabilities of most of the individuals the organization served, all of whom had severe cognitive disabilities and were not able to live independently.

19. Prior to the events described *infra*, the only accommodation Ms. Schiller requested was to inform a Human Resources staff person that she needed to take lunch off once a week to attend therapy.

20. The first time Ms. Schiller requested accommodations for her disabilities was in early August of 2016, approximately one week prior to her termination.

21. Jerry Barton and Mel Robson met with Ms. Schiller to discuss a recreational trip she would be running at "Camp Duncan" about a week later. She had previously been assigned and was planning on attending the trip in the capacity of a co-leader under the supervision of her previous supervisor, Emily Vermeer, but when it became clear that Ms. Vermeer would not be able to attend, Mr. Barton asked Ms. Schiller to assume the leadership role.

22. Ms. Schiller expressed reservations to Mr. Barton about taking full responsibility for the program due to never having been to the camp before, her physical unfamiliarity with the camp and her underlying health issues. But she accepted the assignment conditioned on her being provided accommodations and support.

23. Ms. Schiller told Mr. Barton and Ms. Robson that she had experienced recent exacerbation of the symptoms of her fibromyalgia, chronic fatigue syndrome, and mood disorders, but that those illnesses were manageable as long as she kept her stress level stable. She said that she was confident about leading the camp, but needed resources and accommodations so that she could keep her stress level low and stay healthy enough to lead.

24. Mr. Barton and Ms. Robson expressed willingness to accommodate, identifying a number of ways in which Ms. Schiller would be supported on the trip. They explained that in addition to 7-10 high-school volunteers, she would have two co-leaders who could assist her with managing emergencies and other challenges such as behavioral issues that arose during the course of the trip. They also said that a full-time staff person would alternate each day to provide assistance. They told her to let them know if she needed anything else and acknowledged that they had put her in a difficult position.

25. Brasselina Sabini and Hailey Haas were assigned co-leaders as part of accommodation,. They had previously received the requisite training to serve in leadership roles. Ms. Schiller attended meetings with her two co-leaders, and they all received leadership binders for reference. They also coordinated with one another often in the short amount of time before the camp began.

26. Ms. Schiller, Ms. Sabini and Ms. Haas were confident. A few staff members who were to attend pulled out at the last minute and had to be replaced by less skilled and experienced staff. The three leaders struggled to assign staff to participant groupings that appropriately met the needs of the clients. They voiced these concerns to Becca Zayler and Mary Kate Murphy but also understood how difficult staffing was at the NSSRA.

27. Over the course of the trip to Camp Duncan, however, certain accommodations and some of the general assistance Ms. Schiller was

promised were either not provided or retracted, making it impossible to manage her health conditions.

28. While on the trip, Ms. Schiller successfully dealt with several challenges, including calming several clients who became violent or non-cooperative, tending to a seizure, and tending to another seizure that lasted for more than 5 minutes and therefore necessitated the involvement of emergency health services.

29. On the first day, Ms. Schiller decided to split the group of campers into two since different clients wanted to do different things. She asked the co-leaders to take charge of one group and she took the other.

30. During a meeting that evening, Ms. Schiller learned that Mr. Barton had called one of the co-leaders and asked whether Ms. Schiller was overwhelming her with delegated responsibilities, and asked how Ms. Schiller was doing in the management of the trip. Ms. Schiller was told that Mr. Barton had called other assistants at Camp Duncan as well to check on her. Mr. Barton did not call Ms. Schiller. After the meeting, a staff member who had attended the camp for years took Ms. Schiller aside to say that camp had never run this smoothly and she thought she was doing a superb job.

31. On the second day, Ms. Schiller began experiencing aggravation of her chronic fatigue condition due to lack of sleep caused by the stressors and challenges of the first day at the camp, as well as concern about how and why

her offsite supervisors were contacting other staff to evaluate her performance.

32. Several clients exhibited behavioral problems throughout the course of the day. One became violent and impulsive, climbing gates and jumping off of them, and grabbing a book out of another client's hand so aggressively that the book hit another client in the face. Staff expressed concern about his behavior as the day went on. His staff expressed their concern to me as the day went on. Ms. Schiller made the decision to send him home.

33. Two other clients exhibited behavioral problems. One of them got physical and Ms. Schiller and other staff had to physically restrain her as she fought them off, which was taxing for Ms. Schiller.

34. That same day, another client began crying and had a fit, saying she missed her mother. Ms. Schiller took her to a quiet place and was able to calm her down. Ms. Schiller was the one who took this role, both because she was trained and experienced in dealing with this type of behavior and because it gave her an opportunity to recover.

35. While she was sitting with this client, Becca Zayler and Candice Cunningham, two of her supervisors, arrived and asked in a hostile manner why she was sitting with the client and not with the larger group. She explained what had happened and said she was helping the client collect herself, but they remained critical.

36. They also criticized her decision to send the violent client home. Sending clients home when they exhibit violent or extreme behaviors was not an unusual occurrence, and in the past when Ms. Schiller made similar judgment calls her supervisors had supported her decision.

37. Ms. Zayler and Ms. Cunningham told Ms. Schiller that they were disappointed with how she had been running the camp, and claimed that several of the high school assistants had called to say she was running the trip poorly. Ms. Schiller had gotten the opposite feedback from several of the assistants.

38. Ms. Zayler and Ms. Cunningham then asked why Ms. Schiller was delegating leadership tasks. In particular Ms. Zayler expressed disapproval with the fact that the co-leaders were dispensing medication and that Ms. Schiller delegated to one of them the task of calling 911 while Ms. Schiller was attending to the client having the seizure.

39. Ms. Schiller expressed surprise and responded that she had been told in several meetings that they were her co-leaders, that they had both been trained to lead on their own before the trip and had each received a leadership binder with a medication dispensing form.

40. Contradicting the prior agreement they had made, Ms. Zayler responded that the co-leaders were merely Program Assistants like the high school students, and Ms. Schiller should not have delegated leadership tasks to them, and was not permitted to do so going forward. Ms. Schiller had never previously been

similarly criticized for delegating tasks, and had received positive feedback in performance reviews for previous delegation decisions.

41. The two co-leaders expressed surprise and concern when Ms. Schiller told them they were not permitted to assume leadership responsibilities and were actually Program Assistants.

42. The co-leaders were fully capable of performing leadership roles. Ms. Sabini had run programs before and was a part-time program leader. The other one was fully capable of assuming leadership roles as well; in fact, after Ms. Schiller was terminated she was assigned Ms. Schiller's job.

43. The result was that Ms. Schiller, after having asked for accommodations for her disabilities, was expected to lead a five-day-long camp alone without even the level of support normally provided to leaders for similar trips. Normally trips such as the one Ms. Schiller was leading were led by two full-time recreation specialists with the training and authority to assume leadership tasks.

44. The hostile demeanor with which the supervisors approached and responded to Ms. Schiller heightened her symptoms of anxiety and panic.

45. That evening, Around dinner time, Ms. Schiller and the co-leaders agreed that it would be prudent to contact the office because they were not getting the support that we needed. They had noticed Ms. Schiller was losing her strength and wanted help.

46. Ms. Schiller called the office that night and said she was struggling, having severe anxiety, and as a result was experiencing fibromyalgia and fatigue flare-ups. She explained that she was not getting enough support and needed assistance with the leadership duties. Ms. Zayler said impatiently that as long as Ms. Schiller was on the phone with the office she was not with the campers. Ms. Schiller responded that the campers were winding down in preparation for swimming and were with several other counselors in the room next to her.
47. Ms. Schiller was declined the support she requested. There were at least five other people who could have been assigned to help her, and on information and belief, none of them were contacted in response to these requests for help.
48. The burden of managing the camp without adequate support under difficult conditions and the stress of being berated inexplicably by supervisors when she sought help for these difficulties caused Ms. Schiller to have multiple panic attacks.
49. In the presence of the two co-leaders, Ms. Schiller called Craig Culp, the Executive Director to ask for assistance. Mr. Culp told Ms. Schiller sternly to take him off speakerphone and leave the room. He said he knew why she was calling and that she "needed to get off the phone and pull it together." He called her selfish. Ms. Schiller explained that she needed help and that she had dealt with two seizures, one person who tried to escape, and an

individual who became so violent she had to send him home. Mr. Culp hurried to end the conversation.

50. Ms. Schiller said, "Craig, I have never felt so disrespected my whole life. Listen, I can't be healthy in this situation without the accommodations I was promised I would be provided." Mr. Culp said Ms. Schiller was abandoning her post, and she said no, that she wanted to stay here, but needed help. She reiterated, "Are you going to give me the support?" Mr. Culp said he was not. Ms. Schiller explained that she would be bedridden if she had another episode. Mr. Culp said he would send someone to replace her at noon the next day, and asked whether she "expected to have a job" when she got back. Ms. Schiller said, "I love working for NSSRA. I love my job. I just need your help." Mr. Culp reiterated that he would call someone to replace her and that she should start packing her things to go home. Ms. Schiller had a panic attack in the car on the way home.

51. During a meeting the next day to which Mr. Culp summoned Ms. Schiller, and which Mr. Barton and Ms. Robson attended, Mr. Culp stated that Ms. Schiller had lost their trust and could never regain it. She asked for the opportunity to explain what had happened. Mr. Culp cut her off and said she had one more minute to talk and then she would need to collect her things and leave. In shock, Ms. Schiller stood up and walked down to her office to collect her things.

52. Before leaving Ms. Schiller thanked them for seven years of experience, family, and friendship. She said she was confused and had no idea what had just happened, but was not mad at them. She said that she just wanted to thank them for helping her grow into the person she was that day. She shook and whimpered as she spoke. Then they looked at her in silence, and then Mr. Culp asked her to leave.

53. As a result of her termination, Ms. Schiller experienced severe depression, post-traumatic stress symptoms, and health flare-ups. She was incapacitated for more than a month and has been struggling to recover since then, with the help of mental health professionals, from the harsh and bewildering nature of her treatment at the end of her employment.

54. For example, Ms. Schiller continues to experience severe anxiety whenever she is out in the community for fear she will run into someone from NSSRA, and avoids socializing in places where she may encounter NSSRA staff or former clients. She has trouble sleeping and has frequent recurring dreams about the events that took place.

55. Ms. Schiller has applied for but has been unable to obtain comparable employment, and is unable to provide a positive reference for her seven years of employment at NSSRA.

## COUNT I
## ADA Discrimination and Failure to Accommodate in violation of the ADA

56. Paragraphs 1 through 55 are incorporated by reference as if fully set out herein.

57. At all relevant times, Plaintiff was disabled and regarded as disabled within the meaning of the ADA.

58. On information and belief, Defendant was aware of Plaintiff's disability at all relevant times.

59. Plaintiff was able to perform the essential functions of her position.

60. Defendant refused to provide Plaintiff reasonable accommodations in violation of the ADA, even while providing similar support to non-disabled employees.

61. Plaintiff was terminated because of her actual or perceived disability.

## COUNT II
### Retaliation in violation of the ADA

62. Paragraphs 1 through 61 are incorporated by reference as if fully set out herein.

63. Plaintiff requested a disability accommodation in the form of staff support while leading a camp for Defendant.

64. Defendant expressed hostility to her requests for assistance, and ultimately terminated her in retaliation for those requests.

### Prayer for Relief

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendant and order the following relief:

A. Back pay, including but not limited to the loss of wages and other benefits suffered by reason of the termination;

B. Compensation for the emotional distress Plaintiff suffered as a result of her termination;

C. The cost of medications and treatment required in order to treat Plaintiff's emotional distress;

D. Prejudgment interest in the amount of lost compensation found due;

E. Reasonable attorney fees, expert witness fees, and other litigation expenses; and

F. Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff requests trial by jury.

                                                                                                         Respectfully Submitted,

                                                                                                                        /s/ Rima Kapitan
                                                                                            One of Plaintiff's Attorneys

Rima N. Kapitan
Atty. No. 6286541
Yusra S. Gomaa
Atty. No. 6299883
Kapitan Law Office
P.O. Box 6779
Chicago, Illinois 60680
rima@kapitanlaw.net
ygomaa@kapitanlaw.net
Ph: 312-566-9590
Fax: 312-566-9591